# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 10 CR 786-2 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| JAMES JEDYNAK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant James Jedynak's post-trial motion for judgment of acquittal or, alternatively, for a new trial [132]. For the reasons set forth below, the Court grants Defendant's motion for acquittal as to Count 3 and denies Defendant's motion [132] in all other respects.

**I.  Background**

The Government charged Defendant James Jedynak and co-defendant Gail Howard with defrauding approximately 70 investors in a California-based voice-over-internet-protocol ("VOIP") company called Unified Worldwide Transport ("UWT") between 2003 and 2007. Howard was UWT's President, and Jedynak was responsible for recruiting individuals and entities to invest money in UWT.[1] On October 3, 2013, following a three-week trial, a jury convicted Defendant James Jedynak on the five counts of wire fraud charged against him in the indictment. Defendant challenges his convictions on Counts 3, 4, and 5, moving for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, alternatively, a new trial under Rule 33. He does not challenge his convictions on Counts 1 and 2.

---

[1] On January 9, 2013, Defendant Howard pled guilty to Count 1 of the Indictment.

At trial, the Government presented evidence that Jedynak and Howard raised more than $35 million from investors and lenders by falsely representing that UWT would use their funds to acquire telecommunications routes, build network infrastructure, provide working capital, repay debt, and purchase licenses and equipment. Government witnesses testified, among other things, that Jedynak represented that he would not receive any compensation from UWT until investors received all of their principal back. Jedynak and Howard directed investors and lenders to send their money to KKJ Holdings, a company of Jedynak's. Jedynak then deposited investor and lender funds into a KKJ Holdings Harris Bank account that he controlled and then split the funds with Howard. Evidence was presented from which the jury could have found (and evidently did find) that Howard and Jedynak misappropriated (and concealed their misappropriation of) millions of dollars' worth of investor and lender funds.

The Government also presented evidence that Defendants falsely represented to investors that UWT had entered into a contract with Caterpillar Inc., a Fortune 500 Company headquartered in Peoria, Illinois, to carry Caterpillar's international VOIP traffic. Defendants represented that Caterpillar owed UWT a significant amount of money as a result of this contract and had caused UWT to experience a substantial decrease in anticipated revenues by failing to pay it. Howard and Jedynak made these representations to explain UWT's failure to pay investors their promised principal and interest payments and to induce them to make additional investments. Defendants also distributed to certain investors information and financial statements that contained false information about the purported Caterpillar accounts receivable balance. Defendants gave one investor a fraudulent agreement purporting to evidence a contractual relationship between Caterpillar and UWT. However, evidence was presented at trial

that there never was a contract between UWT and Caterpillar and that Caterpillar did not owe money to UWT.

The trial evidence came from a variety of sources, including investor testimony about the representations made by Jedynak and Howard and the documents and materials that Howard and Jedynak provided to investors. The Government also introduced copies of the Caterpillar contract and accounts receivable that Jedynak and Howard provided to certain investors. as well as testimony from Caterpillar executives confirming that no such contract or relationship between Caterpillar and UWT existed. In addition, the Government presented voluminous financial records showing that millions of dollars investors provided to Jedynak and Howard never reached UWT, but instead were deposited into the bank account that Jedynak controlled and eventually split between Howard and Jedynak.

Jedynak's principal defense was good faith. He asserted that Howard was the mastermind of the fraud and that he, like the investors who testified at trial, was a victim of Howard's criminal scheme.

## II. Legal Standards

### A. Motion for Judgment of Acquittal

Defendant moves for a judgment of acquittal pursuant to Rule 29 with respect to Counts 3, 4, and 5 of the indictment. Counts 3, 4, and 5 charged Defendant with wire fraud in violation of 18 U.S.C. § 1343. Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *U.S. v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); see also *U.S. v. Jones,* 713 F.3d 336, 339–40 (7th Cir. 2013); *U.S. v. Berg,* 640 F.3d 239, 246 (7th Cir. 2011); *U.S. v. Dinga,* 609 F.3d 904, 907 (7th Cir. 2010); *U.S. v. Morris,* 576 F.3d 661, 665–66 (7th Cir. 2009). The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "'must convince' the court that, even in that light, 'no rational trier of fact could have found him guilty beyond a reasonable doubt.'" *Warren,* 593 F.3d at 546 (quoting *U.S. v. Moore,* 572 F.3d 334, 337 (7th Cir. 2009)); see also *U.S. v. Eller,* 670 F.3d 762, 765 (7th Cir. 2012); *U.S. v. Doody,* 600 F.3d 752, 754 (7th Cir. 2010) (stating that the inquiry is "whether evidence exists from which any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt"). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *U.S. v. Presbitero,* 569 F.3d 691, 704 (7th Cir. 2009) (quoting *U.S. v. Moses,* 513 F.3d 727, 733 (7th Cir. 2008)); see also *Warren,* 593 F.3d at 546.

It follows that under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *U.S. v. Arthur,* 582 F.3d 713, 717 (7th Cir. 2009); see also *U.S. v. Severson,* 569 F.3d 683, 688 (7th Cir. 2009). Rather, "[s]orting the facts and inferences is a task for the jury." *Warren,* 593 F.3d at 547. The Seventh Circuit teaches that:

> [t]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Moore,* 572 F.3d at 337 (quoting *Jackson v. Virginia,* 443 U.S. 307, 318–19 (1979)); see also *U.S. v. Hollnagel*, 955 F. Supp. 2d 830, 835-836 (N.D. Ill. 2013).

**B.    Motion for New Trial**

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a); see also *U.S. v. Smith,* 674 F.3d 722 (7th Cir. 2012) (reviewing a district court's order on a Rule 33 motion for abuse of discretion); *U.S. v. McGee,* 408 F.3d 966, 979 (7th Cir. 2005). "'[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.'"  *U.S. v. Eberhart,* 388 F.3d 1043, 1048 (7th Cir. 2004) (quoting *U.S. v. Kuzniar,* 881 F.2d 466, 470 (7th Cir. 1989) (overruled on other grounds*,* 546 U.S. 12 (2005)).

"'A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'"  *Eberhart,* 388 F.3d at 1048 (quoting *U.S. v. Santos,* 20 F.3d 280, 285 (7th Cir. 1994)).  The court may grant a new trial if the jury's "verdict is 'so contrary to the weight of the evidence that a new trial is required in the interest of justice.'"  *U.S. v. Washington,* 184 F.3d 653, 657 (7th Cir. 1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded. Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."); see also *U.S. v. Chambers,* 642 F.3d 588, 592 (7th Cir. 2011).  Put another way, "[t]he court should grant a motion for a new trial only if the evidence

'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *U.S. v. Swan,* 486 F.3d 260, 266 (7th Cir. 2007) (quoting *U.S. v. Reed,* 875 F.2d 107, 113 (7th Cir. 1989)).

## III. Discussion

### A. Motion for Judgment of Acquittal

#### 1. Count 3

Count 3 charged Jedynak with causing a wiring of $100,000 worth of UWT investments on October 6, 2005, from Jedynak's KKJ Holdings bank account in Chicago, Illinois, to an account of Gail Howard's in San Diego, California. Jedynak maintains that the Government has failed to present evidence that the transaction in Count 3 was part of the alleged scheme to defraud UWT investors.

To support a wire fraud claim, the Government had the burden of proving that Jedynak: (1) "participated in a scheme to defraud;" (2) "had the intent to defraud;" and (3) "used interstate wires in furtherance of the fraud." *U.S. v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012); see also *U.S. v. White*, 737 F.3d 1121, 1129 (7th Cir. 2013). "A scheme to defraud requires 'the making of a false statement or material misrepresentation, or the concealment of material fact.'" *United States v. Sloan*, 492 F.3d 884, 890 (7th Cir. 2007) (internal citation omitted). The wire must be "incident to an essential part of the scheme * * * or a step in [the] plot" such that "the success of the scheme must in some measure depend on the mailing or [wire transmission]." *United States v. Powell*, 576 F.3d 482, 493 (7th Cir. 2009) (internal citation omitted). In this case, the Government needed to present evidence that linked the $100,000 wire on October 6, 2005, to the allegedly fraudulent investment scheme; it was not required to link fraudulently obtained funds to any specific source. The question then is whether the Government presented sufficient

evidence to establish beyond a reasonable doubt that the $100,000 involved in the Count 3 transaction was fraudulently obtained.

During trial, the Government introduced into evidence a summary chart through an FBI forensic accountant, Cassandra Sumner, that referenced five individuals who wired funds to KKJ Holdings in the weeks shortly before the wire transmission charged in Count 3: (1) David Spinney, $700,000, on 8/26/05; (2) Richard Sexton, $25,000, on 9/1/05; (3) John Schnurr, $25,000, on 9/1/05; (4) William Downe, $100,000, on 9/20/05; and (5) Ethos Group, $600,000, on 9/29/05. The Government called as trial witnesses David Spinney and Greg Shottenkirk (Ethos Group), whose funds accounted for approximately 90% of these deposits. Consistent with the indictment, the Government argued that the $600,000 wired from the Ethos Group to KKJ on September 29, 2005, was in turn wired to Howard on September 30, 2005, and that the $600,000 wire transfers on consecutive days supported a guilty verdict on the crimes charged in Counts 1 and 2.[2]

Jedynak does not dispute that the Government presented sufficient evidence that the wires from Spinney ($700,000) and Shottenkirk ($600,000) were related to investments in UWT. See [136, at 10]. Nor could he; both Spinney and Shottenkirk testified at trial that they invested in UWT because they were duped by Jedynak and Howard. Moreover, as the Government points out, the allegations in Count 3 were that the $100,000 came from "investments in UWT," not investments from any particular investor. Thus, the Government argues that the jury could have inferred that part of the $700,000 wire from Spinney comprised the $100,000 wire in Count 3.[3]

---

[2] As previously noted, Jedynak does not challenge his conviction on Counts 1 and 2.

[3] The Government also suggests that the jury could have inferred that part of the $600,000 wire from Shottenkirk comprised the $100,000 wire in Count 3, but that argument is in strong tension with the Government's own emphasis on the temporal proximity of the $600,000 wires from the Ethos Group to

Because the Government presented evidence that Spinney was indeed a defrauded investor, it contends that it satisfied the requirement that the wire be part of the scheme to defraud.

But the Government's "Spinney" theory leaves three additional "investors"—Sexton, Schnurr, and Downe—about which the jury heard very little. Jedynak contends that while the Government may not need to tie the $100,000 to any specific source, it must present sufficient evidence that each possible source was the victim of the alleged fraud. For instance, if the funds were intended to be used for the purchase of Howard's personal shares, as opposed to the purchase of treasury shares, then the transfer of those funds to Howard could not be said to be part of the alleged scheme to defraud. Jedynak contends that the Government failed to present any evidence as to what Sexton, Schnurr, and Downe intended, believed, or understood with respect to their transactions with KKJ Holdings. In other words, Jedynak contends that the Government has not presented any evidence that Schnurr, Sexton, or Downe were defrauded UWT investors.

The Government argues that a chart setting forth a UWT ownership list provided to witness Mark Hamer (referred to as the "Hamer Ownership April 5, 2006" exhibit), which included Sexton's and Schnurr's investments ($25,000 each) in UWT, proves that they were defrauded investors. However, that document listed all of the individuals who purchased UWT stock, regardless of whether they were purchasing treasury shares or secondary shares. While the list shows that Mr. Schnurr and Mr. Sexton purchased UWT shares, it shows that there was no capital contribution made to UWT's treasury in either transaction, suggesting that these may have been secondary sales, not purchases of treasury stock. Significantly, several witnesses testified at trial that they knew they were buying secondary shares and that they did not intend

---

KKJ on September 29, 2005, and then on to Howard the following day, as evidence of the crimes charged in Counts 1 and 2.

their funds to go to UWT. Further, Downe, who sent exactly $100,000 to KKJ Holdings on September 20, 2005, just days before the $100,000 wire charged in Count 3, does not appear on the list at all.[4]

The Government also relies on Ms. Sumner's trial testimony. Although Ms. Sumner presented a chart that labeled the five individuals as "investors," Ms. Sumner testified that she had no personal knowledge of whether any of the individuals listed in any of her charts were investors and only came to conclusions about their status from reading FBI interviews, which were not introduced into evidence. More importantly, even assuming that the Government could properly rely on Ms. Sumner's assertions, it begs the key question because classification of an individual as an "investor," without more, does not suffice to establish a connection to the charged fraud. Even those who purchased secondary shares—whose money did not go to UWT—were "investors" in UWT, for they owned shares of the company. Thus, the summary charts do not prove that each listed individual was a defrauded investor who believed that he was purchasing treasury stock and not Ms. Howard's (or someone else's) personal shares. At most, Ms. Sumner's testimony serves as evidence for the source, destination, and amount of money transfers, but does not establish the intentions of the individuals who provided the funds.

Finally, the Government asserts that it believed, based on Jedynak's pre-trial concessions and one of the Court's pre-trial rulings, that Jedynak had conceded that all individuals who wired funds to KKJ Holdings were defrauded UWT investors. But neither Jedynak's statements nor the Court's ruling made that leap. The issue resolved before trial did not pertain to what the individual investors themselves believed about their funds; it was about what Jedynak did with those funds: "If, however, Defendant concedes personal financial gain, then what he spent the

---

[4] According to the Government, Downe's name appears on a separate list of UWT investors that was not introduced into evidence at trial.

money on becomes much less relevant." See August 22, 2013 Order [89], at 6-7. Defendant conceded that some of the funds transferred to the KKJ Holdings account were used for his own personal benefit, thus establishing the probative point that he pocketed and spent the money on his own consumption and obviating the need to present potentially prejudicial evidence setting out the details of the specific personal expenditures. However, Jedynak did not concede that every person who transferred funds to KKJ Holdings was a defrauded investor. The Government still needed to present evidence that each particular investor was defrauded if the Government intended to claim that the transfer of that investor's money constituted wire fraud.

The case law is clear that the charge of wire fraud requires, as an essential element, proof that the wire was in furtherance of the fraudulent scheme. See *U.S. v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2002). In this case, whether the $100,000 in Count 3 is part of the fraudulent scheme is directly dependent on whether the funds could be tied to one or more defrauded investors. See *id*. at 629 ("[Wire fraud statute is] not intended to reach all frauds but only those 'limited instances in which the use of the [wires] is a part of the execution of the fraud.'" (internal citation omitted)); *Powell*, 576 F.3d at 493 ("the success of the scheme must in some measure depend on the mailing [or wire transmission].") In this case, the only way that the $100,000 wire could be tied to the fraudulent scheme was by the Government showing that those funds came from money solicited from a defrauded investor—for instance, someone who was led to believe that he was purchasing shares of UWT treasury stock, not secondary shares. Without such a showing, there is not sufficient evidence proving that the investment was related to a scheme to defraud.

As the Government points out, a complicating factor in this case is the fact that once the funds from the five investors were deposited in Jedynak's account they became commingled, and

thus there is no way of tracing which particular investor's money was withdrawn at any given time. This commingling matters because (1) money is fungible and (2) for purposes of this motion, the Court must treat some of the funds in Jedynak's account as "dirty" and some as "clean." As to the latter point, in light of the testimony at trial and the jury's verdict, Jedynak concedes the sufficiency of the evidence establishing Shottenkirk and Spinney as defrauded investors, but there was no testimony or other evidence tying the funds of the other three investors to the fraud. Even so, the Government notes that Shottenkirk's and Spinney's funds alone constitute approximately 90% of the common pot. The question is whether that percentage is sufficient to prove the Government's case beyond a reasonable doubt.

The parties have not cited, nor has the Court's own research found, wire fraud cases that address circumstances like these. The Government draws the Court's attention to money laundering cases and suggests that the Court follow the logic of those cases. Jedynak points out some reasons not to view the money laundering cases as too closely analogous. But, as explained below, even if the Court were to look closely to those cases for guidance, the lines that they draw ultimately support Jedynak's argument, not the Government's, on the facts of this case.

The Government cites cases from the Fourth and Fifth Circuits in which the courts have addressed the issue of commingled funds and the sufficiency of the evidence. In *United States v. Moore*, 27 F.3d 969, 976 (4th Cir. 1994), the court of appeals held that "where the funds used in the particular transaction originated from a single source of commingled illegally-acquired and legally-acquired funds or from an asset purchased with such commingled funds, the government is not required to prove that no 'untainted' funds were involved, or that the funds used in the transaction were exclusively derived from the specified unlawful activity." Similarly, in *United*

*States v. Davis*, 226 F.3d 346, 357 (5th Cir. 2000), the court held that "when the aggregate amount withdrawn from an account containing commingled funds exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account." The Seventh Circuit generally has "adopt[ed] the Fourth and Fifth Circuit approaches to the Section 1957 [money laundering] cases," and thus has rejected the "'all or nothing' approach" of the Ninth Circuit "as unworkable" and agrees that "[t]he government does not need to trace every dollar of income and connect it to a specific instance of laundering." *United States v. Haddad*, 462 F.3d 783, 792 (7th Cir. 2006).

In view of the foregoing discussion, this Court concludes that the Seventh Circuit likely also would agree with the Fifth Circuit "that where an account contains clean funds sufficient to cover a withdrawal, the Government can not prove beyond a reasonable doubt that the withdrawal contained dirty money." *United States v. Loe*, 248 F.3d 449, 467 (5th Cir. 2001) (explaining that the "rule of decision" announced in *Davis* "implies the converse" rule from *Loe* quoted above). Applying that principle to the facts of this case requires acquittal of Jedynak on Count 3. To be sure, as the Government notes, with or without Shottenkirk's money in the mix, the great bulk of the money in Jedynak's account during the relevant time period came from Shottenkirk and Spinney or Spinney alone, thus supporting an inference that Spinney's money constituted some or all of the $100,000 transfer charged in Count 3.[5] But, under *Loe*, that is not enough to establish guilt beyond a reasonable doubt. The amounts from Sexton, Schnurr, and Downe for which there is no evidence of fraud ($150,000 in "clean funds") exceed the withdrawn amount ($100,000 in "dirty funds") alleged to constitute the charged fraud. Had the

---

[5] Jedynak counters with his own plausible suggestion that Downe was the likely source of the $100,000 because he made a contemporaneous contribution in exactly that amount.

Government presented any evidence that Schnurr, Sexton, or Downe believed they were investing in UWT treasury shares or had otherwise been led to invest on the basis of fraudulent conduct by Jedynak, there would be no issue. But because the Government did not present evidence that would either (a) eliminate Schnurr, Sexton or Downe as the source of the funds or (b) indicate that they were defrauded, it cannot now support a finding of guilt beyond a reasonable doubt on Count 3 by pointing to Spinney (or Shottenkirk) as the source. *Loe*, 248 F.3d at 467. Jedynak's motion for judgment of acquittal on Count 3 therefore is granted.

        2.     *Counts 4 and 5*

Counts 4 and 5 involve Doug Paul's purchase of $1.65 million worth of UWT shares on February 7, 2006. Count 4 identifies a February 7, 2006 wire of $1.65 million from DLP Management, a company controlled by Paul, to KKJ Holdings. Count 5 identifies a February 8, 2006 wire of $1.6 million from KKJ Holdings to Ms. Howard's bank account. There is no dispute that Jedynak received the wire charged in Count Four and caused the wire charged in Count Five to be sent. Yet Jedynak contends that there is no evidence that he knew that Paul understood or believed that Paul was purchasing treasury shares directly from UWT. On the contrary, Defendant contends that the only evidence offered at trial on the question of what Jedynak knew or understood established that Jedynak believed that Mr. Paul was purchasing one of Howard's personal shares.

Paul explained, and e-mail evidence corroborated, that Howard directed Paul to wire his $1.65 million to Jedynak's KKJ account at Harris Bank. Once Paul's money arrived in Jedynak's account, Jedynak kept $50,000, and wired $1.6 million on to Howard's personal account. Financial records demonstrated that Howard sent $200,000 back to Jedynak, sent a small amount to UWT, and spent the remainder of the funds on herself.

13

Sufficient evidence was presented at trial to support the jury's conclusion that the handling of Paul's investment constituted wire fraud. First, Paul testified that he intended to purchase treasury shares from UWT, not from Howard personally, and that he did not intend any of his money to go to Jedynak. Next, Paul had signed a Unit Payment Agreement with Jedynak whereby Jedynak had agreed not to be paid anything until all of Paul's principal investment was returned. Thus, Paul had no reason to believe any of his UWT investment funds would go to Jedynak personally. Paul also explained that he and Jedynak were not speaking at that point, and he would never have wanted any of his money to go to Jedynak.

Jedynak contends that two pieces of evidence proved that he believed that Paul was purchasing Howard's personal shares of UWT, as opposed to UWT treasury shares, and therefore that he and Howard were justified in splitting Paul's money between them. First, Jedynak points to an e-mail that Greg Kitter sent to investor Andy Meardon in which Jedynak requested that Paul's next unit purchase come from an existing shareholder. But this e-mail was only Defendant's proposal, and Meardon testified that he did not even pass it along to Paul because it would not have benefitted UWT. Next, Defendant introduced through Kitter a February 7, 2006 phone conversation that Kitter claimed to have overheard between Jedynak and Howard. According to Kitter, Jedynak told Kitter that (1) he was on the phone with Howard, (2) Howard had just informed him she was selling one of her UWT shares to Paul, (3) Paul was wiring $1.65 million to KKJ Holdings, and (4) KKJ Holdings was to deduct $50,000 and send $1.6 million on to Howard. However, even though this evidence was introduced at trial, the jury was not obligated to credit it. Evidence was presented at trial that Jedynak and Howard lied to both UWT's investors and Kitter, and the jury likely concluded that they were doing so here as

well. At best, the e-mail and testimony offer a competing theory of evidence that the jury rejected.

C.  **Motion for a New Trial**

Defendant Jedynak seeks a new trial based on the Government's argument regarding Count 3 and the exclusion of certain evidence. Because the Court will grant Jedynak's motion for judgment of acquittal under Rule 29 as to Count 3, it need not consider his Count 3 argument under Rule 33.

*1.  Kitter's conversation with Howard on February 7, 2006*

As to evidence pertinent to Counts 4 and 5, Jedynak argues that he should have been permitted to introduce into evidence a conversation that Kitter allegedly had with Howard on February 7, 2006, in which Howard purportedly told Kitter that Paul was purchasing one of her UWT shares and not treasury shares. Defense counsel argued that the conversation was not being offered for the truth of the matter asserted; the Court disagreed, found that the conversation was hearsay, and barred its introduction.

Jedynak contends that the conversation was not hearsay because it was (1) corroborative of other evidence that he introduced—primarily, corroboration for what Jedynak told Kitter about Jedynak's conversation with Howard—and therefore not being offered for the truth of the matter asserted; (2) offered to establish Ms. Howard's state of mind; and (3) offered to establish Kitter's state of mind. Jedynak also contends that, at a minimum, the part of the conversation where Howard directed Kitter to wire $1.6 million to her should have been admitted because it was a command. See *United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011) (noting that a command is not hearsay "because it is not an assertion of fact.").

Jedynak's arguments are unpersuasive. The conversation between Kitter and Howard illuminated nothing about Jedynak's state of mind because he was not a participant in the conversation, and Kitter's and Howard's states of mind are not relevant to the jury's inquiry. Further, contrary to Jedynak's contention, the conversation was being offered for its truth—that Paul was purchasing Howard's UWT shares and not treasury shares. Finally, to the extent that the snippet of the Kitter-Howard conversation in which Howard directed Kitter to wire $1.6 million may have been admissible as a command, its exclusion was harmless in that the jury learned that $1.6 million in fact had been wired from Jedynak's KKJ account to Howard and that Jedynak and Howard had agreed that Jedynak could keep $50,000 of the $1.65 million total amount. Given the testimony as a whole, the point that Jedynak sought to make by introducing the "command"—namely, that Kitter wired $1.6 million (and not $1.65 million) to Howard at her request—was communicated to the jury, and the further point the Jedynak sought to make— that Howard told Kitter that Paul was buying one of Howard's shares, not a treasury share—was properly excluded as hearsay.

### 2. *Testimony of Peter Melley*

Jedynak contends that the Court should have excluded testimony from Peter Melley, a representative of FINRA. Mr. Melley was offered to testify as to tests that Mr. Jedynak took to be certified as a seller of securities. Defense counsel objected to Mr. Melley's testimony, arguing that it was irrelevant as none of the sales of UWT shares were governed by FINRA. In response, the Government represented to the Court that it would establish that the sales of securities were, in fact, governed by FINRA. According to Defendant, no such showing was ever made, and therefore Melley's testimony was prejudicial given that it was offered to imply that the ethics standards covered by these tests applied to Jedynak when he was selling shares of

UWT, a fact that was not established at trial. Further, Jedynak contends that the testimony was especially prejudicial as it implied that he had violated these FINRA ethics standards, a fact not relevant to the charged counts or established by the evidence actually related to the UWT investments.

After considering the arguments advanced in the post-trial briefs, the Court concludes that the decision to allow the testimony of Peter Melley was appropriate and certainly was not an abuse of discretion. Peter Melley testified about the security licenses that Jedynak held and the tests he needed to pass to acquire those licenses. These points were relevant to prove Jedynak's knowledge and sophistication about investments, in order to rebut Jedynak's defense that he was acting in good faith and to sustain the Government's burden of proving that Jedynak instead had the requisite intent to defraud. Moreover, the sale of unregistered securities is governed by FINRA. Any prejudice to Jedynak from the inference that he violated FINRA ethics standards is outweighed by the probative value of the evidence: namely, that Jedynak had substantial knowledge and experience with securities and, frankly, should have known better. It also aided the jury in assessing whether Jedynak was, as his lawyers argued, Howard's lackey, or whether he was, as the Government contended, her partner in crime.

### 3. *Testimony of Scott Cummings*

Defendant also contends that the Court should have excluded testimony from Scott Cummings as to the amount of assets UWT had when it filed for bankruptcy. The Government elicited testimony from Cummings that the court in UWT's bankruptcy proceeding found that UWT only had $7,000 worth of assets. Defense counsel objected that no foundation had been established to show that Cummings would be aware of the bankruptcy proceeding. The Court

17

overruled the objection, noting that Cummings' involvement in UWT was a sufficient basis for his knowledge of the bankruptcy findings.

The evidence at trial established that Cummings was one of the two members of UWT's Executive Committee and was responsible for managing various aspects of the company. Moreover, Cummings testified that he funded UWT's bankruptcy, personally paying to retain its bankruptcy attorney and communicating with him, because he believed—mistakenly—that UWT had assets worth pursuing. Thus, the Court did not abuse its discretion in concluding that Cummings had a sufficient foundational basis to testify to matters related to UWT's bankruptcy.

        *4.*       *The Government's argument with respect to Count 3*

Jedynak contends that, given a dearth of evidence as to the source of the funds wired in the October 6, 2005 transaction underlying Count 3, the Government should not have been allowed to argue that the funds deposited into KKJ Holdings by Sexton, Schnurr, and Downe involved "investor funds." According to defense counsel, he objected at the outset of Ms. Sumner's testimony, arguing that the Government should not be able to elicit testimony from Ms. Sumner that the transactions of Sexton, Schnurr and Downe were related to UWT. According to defense counsel (without citation to the transcript, which neither side bothered to order), the Government agreed that it would not do so. Yet, at closing, the Government argued that the funds comprising the wire transaction in Count 3 came from defrauded investors.

The summary chart admitted at trial established, at least as to Sexton and Schnurr, that investments in UWT had been made in their names. However, the Court need not address any further Jedynak's arguments for a new trial as to Count 3 based on the purportedly improper argument by the prosecutors because (as noted above) the Court has concluded that it must grant Jedynak's motion for acquittal on that Count.

**IV.    Conclusion**

For these reasons, the Court grants Defendant's motion for acquittal as to Count 3 and denies Defendant's motion [132] in all other respects.

Dated:  May 6, 2014  
_____  
Robert M. Dow, Jr.  
United States District Judge